*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

*In re* S. L. KORDUPEL, Minor.

UNPUBLISHED
March 30, 2023

No. 359419
Livingston Circuit Court
Family Division
LC No. 19-015924-NA

ON REMAND

Before: K. F. KELLY, P.J., and LETICA and RICK, JJ.

PER CURIAM.

This case returns to us on remand from the Michigan Supreme Court and is the third time this case has been before us. Most recently, respondent-mother had the rights to her child, SK, terminated by the trial court, a decision that we affirmed in an unpublished opinion. *In re Kordupel*, unpublished per curiam opinion of the Court of Appeals, issued September 29, 2022 (Docket No. 359419).[1] In lieu of granting respondent's application for leave to appeal, the Michigan Supreme Court has directed us on remand to address the question of whether the trial court clearly erred when it terminated respondent's parental rights because "the foster parent intentionally impeded reunification efforts despite the court-ordered goal of reunification." *In re Kordupel*, ___ Mich ___; 982 NW2d 400 (2022), citing *In re Mason*, 486 Mich 142, 152; 782 NW2d 747 (2010). Finding no errors warranting reversal, we affirm.[2]

In respondent's first argument, she asserts that RB created an environment in which SK had to choose between respondent and RB. For example, she claims RB told SK that if SK returned

---

[1] In a prior opinion, we affirmed the trial court's order of adjudication and initial dispositional order placing SK with petitioner, RB, under a fictive kin order. *In re Kordupel*, unpublished per curiam opinion of the Court of Appeals, issued May 28, 2020 (Docket No. 350559).

[2] A thorough recitation of the facts leading to termination has been set forth in our previous opinions.

to respondent's care, she would never see RB again. These actions by RB, respondent contends, undermined parenting time to such an extent that it denied respondent the ability to participate in the activity. Contrary to respondent's assertions regarding RB's conduct, however, the trial court found that RB's conduct did not undermine parenting time. The trial court stated:

> [Laurie Russell, a foster care licensing specialist] opined that [RB] was always careful to ensure that SK did not overhear adult conversations about the foster care situation. She also testified that Dywanda Knight, SK's prior caseworker, never had any issues with [RB]. Only after Amanda Phillips-Heinrich became SK's caseworker were any accusations about [RB] coaching SK made, and two licensing complaints were made against [RB]—one in December 2020 and one in 2021. Ms. Russell was aware that [RB] believed the reunification with [respondent] was not in SK's best interests, but she found [RB] to always be compliant and cooperative with the [parent agency treatment plan] and services. The [Department of Health and Human Services (DHHS)] case reports support this finding. While [RB] has been open with this Court about wishing to change the permanency goal from reunification to adoption, the case reports demonstrate that [RB] brings SK to every parenting time visit, every therapy session, every service, and she is timely. She has never been observed to discourage SK from interacting with [respondent].

We will not disturb the trial court's findings of fact unless respondent can show the trial court clearly erred. *In re JCB*, 336 Mich App 736, 747-748; 971 NW2d 705 (2021). Similarly, we will not reweigh the evidence or the credibility of the witnesses when deciding if the trial court clearly erred. *Id*. at 748. Although the trial court did conclude that some of RB's behavior was inappropriate, such as terminating one parenting time session on Zoom early, the court determined RB did not undermine reunification efforts between SK and respondent. As noted by the trial court, except for one service provider in the case, all professionals who testified stated that "SK had no bond or attachment" with respondent even after two years of parenting time. The trial court highlighted the fact that SK would try to avoid parenting time visits, stating that SK would "sob[] hysterically after the visit, yell[] at [respondent], and at least once, soil[ed] herself during the visit." SK would also exhibit involuntary spasms that increased in frequency when parenting time occurred. As the trial court noted, the issues involving parenting time were extensive and could not be explained by simply blaming RB, which respondent was prone to do in lieu of taking responsibility herself: "While [respondent] stated during testimony that she is aware she is responsible for SK being placed in protective custody, [respondent]'s testimony that [RB] was the one responsible for SK' s trauma, coupled with her nonchalance as to SK's visibly worsening symptoms of stress strongly supports that [respondent] lacks insight into her own actions, and is unable to place SK's wants and needs above her own." The trial court's findings of fact in this regard were not clearly erroneous and we therefore affirm the trial court's order concluding that RB did not undermine respondent's ability to meaningfully participate in parenting time.

Next, respondent contends that RB's opposition to reunification undermined any efforts made by DHHS toward that goal and "denied" respondent the opportunity to reunify with SK. "Reasonable efforts to reunify the child and family must be made in all cases except those involving aggravated circumstances . . . ." *In re Mason*, 486 Mich at 152; see also *In re Rippy*, 330 Mich App 350, 355; 948 NW2d 131 (2019) ("Reasonable efforts to reunify the child and family must be made in all cases except those involving aggravated circumstances under MCL

-2-

712A.19a(2).").  As far as we understand respondent's argument, she claims she was denied reasonable efforts toward reunification because RB opposed that goal.  But respondent fails to connect the dots for this Court as to how RB's opposition to reunification made that goal "impossible."

Respondent contends in support that RB's decision to hire a private investigator to surveil respondent undermined the goal of reunification.  As correctly noted by the trial court, however, there was no evidence that the private investigator had any contact with respondent or SK and, therefore, could not have done anything to "undermine" respondent's attempts to bond with SK.  Respondent also claims RB "manipulated" the process with DHHS and the trial court by improperly disclosing confidential information and by "forum shopping" judges.  In neither case, however, does respondent explain how this conduct undermined her ability to successfully complete the steps toward reunification as ordered by the court.  As noted above, there was no evidence the private investigator spoke with or otherwise contacted respondent or SK.  Thus, we fail to see the relevance of respondent's contention that the investigator's possession of the confidential information somehow undermined respondent's ability to demonstrate progress toward reunification.  Similarly, the fact that RB sought *and obtained* disqualification of the first trial court judge is irrelevant to respondent's success—or lack thereof—in achieving the goal of reunification.

Although the Michigan Supreme Court remanded the case to us to consider respondent's arguments concerning RB's alleged interference with reunification, the Supreme Court vacated the entirety of part III-A of our opinion, which addressed respondent's arguments regarding reasonable efforts more broadly.  Because we do not read the Supreme Court's order as otherwise undermining the remaining analysis contained in part III-A, we readopt that analysis here.

Before a court may terminate an individual's parental rights, the petitioner must make reasonable efforts to reunite the family.  *In re Hicks/Brown*, 500 Mich 79, 85; 893 NW2d 637 (2017), citing MCL 712A.18f(3)(b) and (c); MCL 712A.19a(2).  "The adequacy of the petitioner's efforts to provide services may bear on whether there is sufficient evidence to terminate a parent's rights."  *In re Rood*, 483 Mich 73, 89; 763 NW2d 587 (2009) (opinion by CORRIGAN, J.).  While the petitioner has a responsibility to expend reasonable efforts to provide services to secure reunification, the respondent also has "a commensurate responsibility . . . to participate in the services that are offered."  *In re Frey*, 297 Mich App 242, 248; 824 NW2d 569 (2012).  A respondent has the responsibility to not only cooperate and participate in the services but also to benefit from them.  *In re TK*, 306 Mich App 698, 711; 859 NW2d 208 (2014).  And to prevail on a claim that the petitioner's reunification efforts were inadequate, a respondent must demonstrate that she would have fared better if sufficient services were offered.  *In re Fried*, 266 Mich App 535, 543; 702 NW2d 192 (2005).

The trial court found that DHHS made reasonable efforts for reunification by providing respondent with "numerous services to address her barriers to safe parenting," which included "psychological evaluation, substance abuse assessment, substance abuse treatment, random alcohol and drug testing, co-occurring counseling, medical, dental, and mental health services, Family Team Meetings, Michigan Automated Prescription System, home visits, parenting class, sex offender risk assessment, Wraparound services, supervised parenting time visits, and family therapy."  Respondent's parenting time was also increased, giving her "more opportunities to heal

the parent-child bond with SK, and more opportunities to demonstrate her parenting skills." Yet, the trial court found that "[d]espite this plethora of services provided, none have been successful in making reunification possible."

Respondent does not dispute that DHHS provided the services identified by the trial court; however, respondent contends that DHHS failed to provide SK and respondent with visits facilitated by an independent, third-party therapist familiar with attachment and trauma.[3] Respondent also contends that DHHS delayed finding a TF-CBT therapist for SK as recommended by the trauma assessment. She argues that with these supports, she would have fared better in her efforts to reunite with SK.

SK's trauma assessment took place in December 2019 and the report was finalized in February 2020. Restrictions resulting from COVID-19 were initiated in March 2020, the same time period the trial court ordered that parenting time be supervised by a neutral independent therapist familiar with attachment and trauma. DHHS attempted to locate a therapist but was unsuccessful, because of both the lack of a qualified therapist in the area and the COVID-19 pandemic. In the meantime, DHHS arranged in April 2020 for SK's individual therapist and respondent's individual therapist to work together to jointly supervise parenting time until a therapist could be located. DHHS subsequently arranged for a trauma-certified therapist, Megan Vaccaro, to provide family therapy beginning in December 2020. At the same time, DHHS also referred SK and respondent to Jennifer Campau for TF-CBT therapy to repair the caregiver relationship and to address the effects of trauma. DHHS thus made reasonable efforts to provide therapy with the objectives of establishing a bond and attachment between SK and respondent and addressing SK's trauma. Under these circumstances, respondent has failed to show that the trial court plainly erred by finding that DHHS provided reasonable services to reunify respondent and SK.

Affirmed.

/s/ Kirsten Frank Kelly
/s/ Anica Letica
/s/ Michelle M. Rick

---

[3] Contrary to respondent's suggestion, DHHS did not fail to provide parenting time. When the court gave DHHS discretion to allow supervised parenting time, DHHS did so.